Good morning. May it please the Court, my name is Pamela Van Duyn. I am co-counsel for plaintiff in this case, also the mother of Christopher Van Duyn. This is my first appearance before this Court. It's difficult to overstate the importance of this case, not only for Christopher, but for all disabled children in this country. This case, as it stands right now, represents the proposition that once the parents leave their child's IEP meeting, the school district may provide the services and education they find convenient, regardless of what the IEP requires. It renders the IEP process a complete nullity and cannot stand. IDEA vests authority exclusively in the IEP team to define a free and appropriate public education for the disabled child. IDEA carefully outlines the IEP team and procedures to be followed to assure that the people are in place to define the rights of the child and identify what is a meaningful education for that child. An agreed-to IEP becomes the very definition of FAPE for the child. IDEA clearly requires the school districts to implement the IEP as written. The U.S. Supreme Court in Raleigh similarly affirms that a disabled student's education must be provided in accordance with the IEP. What was the deviation in this case? There were numerous deviations in this case, Your Honor. They are outlined in our brief. I can go through them if you would like for me to. Our role here is to look at the ALJ findings, and then what standard do we apply to our review? In this case, we had an ALJ hearing, and we also had a proffer hearing at the U.S. District Court. The standard of review for this court, of course, is to review the findings of the ALJ, the findings of fact. All conclusions of law are reviewed de novo. But you review the findings of fact and accept them or not accept them, depending on your view of the facts. Well, wait a minute. Is that the de novo review? Are you suggesting that we review the ALJ findings de novo? Yes, that is the law. That is the standard of review. We don't review facts based upon what we think the facts should be, do we? You said, you hinted that we have a right to judge the facts ourselves or make judgments on the facts. You don't have a right to make judgments on the facts, and we've cited the case in the brief. This is a different type of review. This is not a typical agency review, but under IDEA, this court does review de novo all conclusions of law and also are obligated only to give due weight to factual findings of the ALJ and the District Court. But you also are entitled to disregard them if you are left with a definite and firm conviction that a mistake has been made. So this is a different standard of review than a typical. That sounds like clear error. Pardon me? That sounds like a clear error review rather than a de novo review. Well, it has been referred to in the courts as a modified de novo review. But there is clear error in the record here, both at the ALJ level and at the District Court level, and we have outlined those in detail there in the excerpts of record at 146, 148, the ALJ's findings. I mean, she just frankly made factual mistakes, and those are set forth here. And the places where the testimony outlines the errors are set forth. Well, as I look at the record, the ALJ found that the IEP was complied with in every respect except with respect to math. That's not quite accurate. She did find that the IEP had not been implemented in the area of math, both in terms of a significant loss in the number of hours of instructional time, and she found that the short-term objectives had not been pursued. And so she found a denial of faith on that issue. But you prevailed to that extent. We prevailed to that extent, but there's never been any remediation ordered to compensate Christopher for that loss of service and that loss of the pursuit of those educational goals. Well, why don't you tell us what is the single most important error made by the ALJ in this case?  Sure. I also wanted to, the ALJ also found that the behavior management plan had not been complied with. But she failed to find that that was a denial of faith, even though she acknowledged that it didn't comply with the IEP. And, you know, the biggest problem in this case is we have an IEP. The statute authorizes the IEP team, who are the most knowledgeable people about this child, to craft an educational plan for the school district to implement. And that is the standard, and that is the biggest problem that the ALJ made, the biggest mistake the ALJ made, and the biggest mistake the district court made. Because they just, they refused to accept the presumption that a meaningful education to Christopher is what the IEP called for. They would doubt whether or not, you know, this really mattered or that really mattered if they didn't do one thing or another. And the point is that it did matter, and there were substantial deviations in this IEP in a number of areas. Another error that the ALJ made was just interpreting the document itself. She didn't apply any legal standard of review to try to determine what the IEP's team's intent was, which, again, is the gold standard here. The school district is obligated under the law to provide all of the services and all of the education set forth in the IEP. That is clearly the law. There isn't a substantial compliance component. There isn't anything that says the IEP, as written, must be complied with. Does that mean that any deviation, therefore, is fatal? You know, on the face of the law, I would say, yes, that is the case. There is a Houston case that interjects a de minimis, you know, practical rule there. Under the Houston case, which is really the only implementation case out there in Houston. It was out of Texas. In that case, that's the Bobby R. Houston case. There's also, I think, an Eighth Circuit case, the Clark case. I'm not familiar with that case. But out of Houston, what happened in that case was the IEP required speech pathology services. The speech pathologist was fired or something. There was some period of time when the child did not receive the speech path services. What the district did was, when they hired a new speech pathologist, they compensated. They added the additional time that the child had lost. So there had been no loss of service. So the amount of service required in the IEP was actually delivered to the child. So the deviation was one of timing. And the court said that's de minimis. And obviously, those things happen, and, you know, you would expect there to be adjustment. Would you then, are you suggesting that we should adopt the Fifth Circuit approach then? I have a problem with the Fifth Circuit's approach. And the Fifth Circuit looked to regulations that clearly say that all services must be provided. And that was what determined that case. They said, have all the services been provided that are required for the IEP? When the answer to that question was yes, and they were faced only with a timing issue. And some of those things are unavoidable. Everyone knows that. I mean, you can't expect, you know, to have five speech paths lined up. And if one fails, the next one steps in. Let me give you, just so I can test it, maybe I can step back. This would be helpful to me. Let's suppose that the IEP provides that the student needs his three grade levels below his or her peers. Yes. Okay. And the IEP says, is agreed that with ten hours per week of special tutoring, that the objective is to bring the child up at least one grade level and hopefully all the way up, but a minimum of one grade level. Yes. And let's suppose that in the course of the semester, the school district only winds up providing, say, seven hours per week. And at the end of the semester, the student has come up, in the first hypothetical, he's come up one grade level. Is there a material violation on implementation there? Actually, there is, because ten hours was what was required. Okay, so let me just then, let's suppose that the child came up two grade levels and, in fact, arguably two and a half. So it's basically short of coming all the way up. That would have been the best case under the ten-hour assumption, but it got almost there under the seven hours per week. Then is that material as well? IDEA deals specifically with these circumstances and provides for them. The IEP team comes together, prepares an IEP. There is a system, which was also violated here, of the school district being required to report regularly to the parents. I'm assuming that they report. My point is, if there is a change in the circumstance of the child in that situation where after seven hours they made all of the progress that they were expected to make, IDEA. Let me just make sure. I want to make this as pure as possible. I understand that we're trying to write across a wide spectrum of individualized circumstances, but let's suppose a parent is not as actively involved as you are. Therefore, a parent is relying on the school district to implement. The school district doesn't hide the fact that they aren't giving ten hours, so there's no failure to notify or consult. Just the parent didn't act on it. The parent just basically let the school district proceed. What I'm trying to then say, at the end of the process, and the parent suddenly comes and sees the end of the process report and is unhappy because the child finds out that the child didn't get the full ten hours, made significant progress, but didn't come up with the full maximum would have been on the best case analysis. That's what I'm trying to understand. How we would evaluate that in failure to implement. If you look at the statute, the statute and the regulations say the school district must ensure that all services set forth in the IEP are provided. They have the ability to do so. They have agreed to do so. They've agreed that that's what's required. If they determine that that's not what's required, their obligation under IDEA is to give notice of a meeting to change the IEP, bring the parents in, discuss the matter, make sure that they're not missing something, and you change the IEP. That's what did not happen here. Okay. Now, what's the remedy at the end of the process, assuming that the child, let's suppose they did seven hours instead of ten, but the child made as much progress as anybody reasonably could have expected. What is the, you say there's a violation because they didn't do what they were supposed to do, but there was no consequence. Under the law, IDEA is very clear. What's the remedy? Well, the remedy is that they get the additional three hours worth that they should have or instructional time that they should have gotten. On a going forward basis. On a going forward basis, yes. How's the child doing now? How is my child doing now? Yes, that's what we're talking about. Yes, yes, yes. He's 18 years old. He remains in school. He has an IEP, and he is still getting all of these services that were outlined for him here. We've got a long history of working with him. His language age, you know, continues to be in the early ages. He has learned to tell time and has achieved a degree of independence and self-sufficiency, which is a primary goal of IDEA. And, you know, he just, he makes slow, steady progress, but he has a very complex set of problems. He's very smart. He can memorize things very, very quickly, but he can memorize an answer but fail to learn the process. And so that's why this IEP was so carefully crafted, because we had been fooled over the years, thinking he was learning something when he was actually memorizing the answer. So this IEP really. The school is now acting properly. He is actually in a different school. We did finally, with the Baker School District, reach a watershed after the Oregon Department of Education determined that there had been a denial of FAPE on his following year IEP. We had a mediated IEP meeting, and things really changed. This year remains unremediated where he lost a large number of services. He was in a completely wrong placement based upon what the IEP called for, and our expert's opinion was that he lost the entire year and regressed, and that was certainly our experience, too, as we testified at the time. I would like to reserve my time. What year is in issue? It is 2001-2002, and the problems occurred only as he transitioned to the middle school, and they simply never staffed to accommodate him and stuck him in the corner when other classes were going on and just put him in circumstances that he was unable to learn in, and the IEP team knew that, articulated it very clearly. You may reserve the balance of your time. Thank you. We'll hear from the school district. Judge Fischer, Judge Ferguson, Judge Oscalin, I'm Rich Conley, representing the Baker School District. Starting out at the beginning, there were questions about the appropriate standard of review, and I do want to elucidate those a little bit. The appropriate standard of review is called in the case law a modified de novo review, and in fact what that represents is that for legal issues, pure issues of law, in other words, there is a de novo review. However, as in this case, where there was substantial factual testimony, as Ms. Van Dine pointed out, both at the ALJ level and before Judge Mossman in the district court, the court actually does afford substantial deference to the factual findings if those findings are what's called, quote, careful and thorough. And I would submit that based on the length of the opinions in this case, the fact that both judges had clear findings of fact that they correlated to their conclusions of law, both proceedings, both the ALJ, over a week's worth of testimony, both of those processes were extremely careful and thorough. So there is a substantial amount of deference that this court does afford to those types of proceedings. It sounds like it's somewhere between clear error and substantial evidence in the record, which is a typical administrative law review. Correct. I would almost call it a hybrid. It's somewhat of a unique animal in review of administrative proceedings. I'm looking at Amanda J. Is that the one you're both looking at? Well, a lot of courts, that's the Semel case, but a lot of courts have inherited that. I just want to make sure we're all talking the same page. Yeah, we're on the same page. Absolutely. And first I want to say, and I know the superintendent of the district wanted me to say this, I don't think, the one thing we can agree on is that Ms. Van Dine, as the parent of this child, has advocated very aggressively and zealously as the mother of this child, and we all acknowledge that. But where the district needs to agree to disagree with this parent is that we did not serve this child appropriately. And I think that's been borne out by the two levels of review in this case, both for a competent administrative law judge, Judge Mize, and a very competent federal district court judge, Judge Mossman. The first, when navigating this case, I think that the issues arise in two basic camps. The first camp are the pure legal questions, and some of those are the threshold questions before this court. The first one is the burden of proof issue that revolves around the Supreme Court's recent 2005 decision, WEAST, W-E-A-S-T. And there, again, I think that the arguments presented by Ms. Van Dine fall a little flat in that she's now arguing that WEAST should not be applied to this case because this is a case about implementation of an agreed-upon IEP, as opposed to WEAST, which dealt with the contents of the IEP. In other words, what was on the page in the IEP. But really, I think that's kind of a distinction without a difference. If you look at WEAST, WEAST really revolves around the very issues that Ms. Van Dine has raised here. She says, well, you shouldn't apply the burden to the parents because in this case, the school district has a virtual monopoly on data and information regarding the education of a child. I think looking just from the transcript of record in this case, it's apparent that, if anything, this case is a booster case for why that's not true. At both the administrative and the district court level, Ms. Van Dine not only had the usual protections afforded under IDEA, in other words, disclosure of records, disclosure of witnesses, et cetera, but Ms. Van Dine as an attorney availed herself of depositions at not only the administrative law level, but also at the district court level. In fact, I believe she basically got two bites of the apple because she deposed many of the same people twice. She had paper discovery afforded litigants in district court. She had interrogatories. She had the full panoply of tools to equalize the playing field between the district, which staff implements the IEP, and the parent. This is not a case where, as you can probably glean, where you had an inactive or a fairly uninvolved parent. Ms. Van Dine was very involved in the process as both a parent and an attorney, and she afforded herself of those procedural protections. So limiting WEIS to only cases where content of the IEP is at issue just doesn't make any sense. The rationale for that case applies universally across the board to all IDEA cases. The second issue is, and I think, I believe Ms. Van Dine raised this as an issue before you today, is saying that the ALJ failed to set a legal standard for interpreting the words in the IEP. And I gather from that she's referring to her argument that you need to look at an IEP as almost like a contract, and apply kind of typical contract interpretation arguments. One of her main ones being that, well, because the district drafted this IEP, that it needs to be construed against the district. And again, factually, legally, that falls flat. An IEP is not a contract. It is a unique creature of statute. And we may or may not get into this, but, for example, this relates a little bit to implementation, but we have what are called annual goals in the IEP, which you've probably seen. And then below that you have short-term objectives. Contrary to what Ms. Van Dine said, the law does not say that you have to implement each one of the short-term objectives at all times in a given day. The regulations, federal and Oregon ODE regulations, are fairly clear that, you know, when you're talking about a classroom environment, a teacher is vested a large amount of discretion to essentially pick and choose short-term objectives and use them as they could decide to implement them all in one day. But the teacher, in his or her own discretion, may say, you know what? I'm going to implement a stair step, a tiered approach. So Johnny working on telling time on a digital clock or Johnny working on identifying appropriate behaviors, he seems to be plateauing on that issue. And if I push him today on that, it's going to be counterproductive for this student. So what I'm going to do is I'm going to pull back. I'm not going to work on that short-term objective today, but instead I'm going to focus on this other short-term objective where he is more amenable to instruction. That acknowledges the basic reality of the classroom. And, again, you know, Ms. Van Dyne is trying to basically say, any non-implementation equals de facto deprivation of free appropriate public education and its material. And even beyond the Houston case and the Bobby Yar case, which I think the rationale in that case is very logical and it's very persuasive, the fact is that when you look at the regulations and the IDEA itself, it's replete with instances that at least the clear acceptance that you don't have to implement every single day and not every single non-implementation results in a denial of faith. For example, there's a regulation that says a school district may hold out a student for ten full school days for any reason whatsoever. Oftentimes when I advise school districts that if there's a student coming in or if there's been a disciplinary issue, the district can hold that student out with virtually, well, actually no instruction for ten full days because, again, that's something that's acknowledged within the law. The other part of the equation here, too, is, and I know all of you have ruled on IDEA cases, the IDEA is not a potential maximizing statute. And I think, Judge Fisher, you gleaned on that a little bit. It's not about, you know, a guarantee that at the end of the year we're going to get those three grade levels. The IDEA speaks to the standard of conferring some, some meaningful educational benefit. The case law in our brief is pretty clear, and it says, again, it's not a contract. It is not a guarantee of success at the end of the year. You don't look at the end and say like you would in an agreement to produce goods and services at the end of the year if you haven't gotten the three grade levels. That may be true, but in my hypothetical I was citing an example, as you'll recall, which is important, which is that there was an agreement, maybe not contractual, but it considered professional judgment between the parents and the school district that ten hours is what was required. And the short-term objectives are generalized. Those are stated as objectives, but the concerns like, as actually turned out in this case, on the math instruction, whether it was a failure to implement what the ALJ found material, the question is where the school district scales back from the quantifiable, if you will, aspects of the IEP. How is a court supposed to make a determination whether or not that is a failure to provide a free, adequate education? And counsel, Ms. Van Dine, suggested that the Bobby R. case set the appropriate standard. Did you have any quarrel with the Fifth Circuit's articulation? Oh, I don't have any concern, Ms. Van Dine. She said she had a problem with Bobby R. I do not have a quarrel. I thought she said the Houston case, which is Bobby R. That is the same case. No. Then if Ms. Van Dine is adopting that, then we have another area of agreement. We've cited that standard throughout these proceedings at both the ALJ level. I don't want to misstate what she said, and she has time on her buttocks. No, that's fine. I want to make sure, because there are only a couple of cases, Bobby R. and then this, I'm not sure I know how to pronounce it. Neosho School District v. Clark, which is an Eighth Circuit case, 2003. Right. But I think, actually, quite a few cases, First Circuit, Second Circuit, Eighth Circuit, they have started, they have adopted that standard. And, again, I think the structure. In implement failures. I believe so. And, again, the thing to remember, too, is that I think the IDEA, even in its terms and regulations, it recognizes that the rule, the standard of any non-implementation is de facto material. That can't be right, because the other structural portions of the IDEA suggest that. Now, in fact, school districts are given some flexibility in implementation, but really the bottom line, as Bobby R. articulated, is, is it a material, substantial non-implementation, and does it result in a deprivation of meaningful educational benefit? Practically speaking, when a court is looking at this case, and I think Judge Mossman did that here, you know, he did get into the issue of this IEP is pretty extensive. Now, the district and the parents spent a lot of time on this, but just to give you a sense of this, this IEP has, I think, over 70, over 70 short-term objectives relating to the meeting annual goals. So think about it practically in a given school day. A teacher has 70 short-term objectives that they can pick on, you know, and review and decide what is the appropriate short-term objective that I need to work on today to move Christopher, again, not a guarantee, but to move him, to give him some meaningful educational progress towards that overarching annual goal. So in that standard, I think that the size, the complexity of the IEP, the reality of the school day, what Bobby Yar recognizes is that, you know what, if the staff are working on a goal area, in other words, communication, and they have a behavior card that they've changed to reflect the realities of the middle school as opposed to the elementary school where the student came, they're going to say, well, first of all, that's working towards the annual goal. It may not be precisely what the parent desires, or it may not be precisely what the parent envisioned or desired or wanted in terms of methodology and implementation. But Bobby Yar says, well, you know, as long as it's a substantial implementation and as long as some progress is being made towards the overarching communication goal, that's sufficient. You're not suggesting that the teachers have the flexibility to make a unilateral decision long-term over the course of a semester and decide that, well, even though the IEP requires, and I come back to the math example, requires a procedure. And they just say, well, we've decided that that procedure, that they don't have to go back and involve parents in that. Let me put it this way, Judge. Let me give you a real-world example. Okay, so you've got a behavior plan, and this isn't necessarily what's in Christopher's plan, but you've got a behavior goal in the area of behavior that says that student X will, by the annual review date, will use appropriate conduct and verbal communication in the classroom. Okay? So one typical initial short-term objective would be, well, student will first learn not to implement or use it, but we want to get him to at least identify what are some appropriate responses. So instead of punching the teacher or a student, what are some appropriate strategies that you can identify that would have been a better strategy than punching Jimmy in the next chair? Okay? The next short-term objective could be, well, now that he's identified it with adult assistance, he will actually start using the appropriate strategies. They call them replacement strategies for inappropriate behavior. And then finally, a typical third short-term objective would be, well, we want him to use those things independently, without adult support, without adult prompt. So you can actually envision situations where teachers, yeah, they do get discretion. Well, but see, I don't think that's responsive. That's saying the short-term objectives have goals. And, of course, the teachers and the parents have agreed to a nonspecific method of implementation. There are objectives. I'm talking about the situation where there are quantifiable, agreed-upon procedures. You talked about the behavior part. That's not some decision on how you sequence. That's a mechanic. Methodology. Well, it's a mechanic because it's physical. It's a card that the parents presumably and the teachers in the district decided, this is a mechanic, a mechanism, a methodology that we have agreed upon as an appropriate educational device to deal with the child's disability. And if the teacher decides, I don't think the behavior card is all that important, as I'm beginning to see how the child is acting out here and working. Therefore, I'm going to suspend using it. She may feel that she's made an appropriate educational decision, but does not the check in the system that the IDEA sets up require the school district to involve the parent in it so that they can sit down and agree with it? Perhaps the next IEP meeting, for example, if it's determined that, you know what, he wasn't really into the behavior cards this year. He wasn't responsive. But what you're saying is kind of the notion of, well, actually, there are two layers to your question. Taking the behavior card issue, and this is precisely what Judge Mossman and ALJ Wise found, was that, yes, the district did not use the behavior card, which is a system of stars. They didn't use it precisely as was used at the elementary school, but they did use the card. They modified it. Under Bobby R., they're saying, you know what, we're not going to get into the specifics of judgment calls by the teacher in terms of methodology and specific implementation. The bottom line was a form of the behavior card was used, and as in this case, the bottom line, again, was that his overarching behavior goal, and I don't have it in front of me, but I think it referred to he'll have no more than two or three behavioral instances per day or per week. Under the behavior management plan that the district implemented and the manner that they did implement, he vastly exceeded that goal. He had, I think, maybe three instances total over a period of months. So, again, the IBEA envisions that we have to look at the big picture. We're not going to get into and second guess our teaching staff, our teachers in the classroom. We're going to say, well, look at the overarching goal. If you're making substantial progress towards that goal, if you're substantially implementing IEP, even though there may be a handful of areas where either you didn't implement it completely or you implemented it, but not quite the way the parent thought you would, that's the standard. That is not a denial of faith, and it's not material. Now, getting back to the issue of MAP, and Judge O'Scanlan, I remember he had an initial colloquy with Ms. Van Dyne about, well, you prevailed on the MAP. I would take issue with describing that as prevailing. We've cited plenty of case law that says that in the IBEA, for example, for purposes of attorney's fees and being the prevailing party, again, you have to obtain some substantial relief. In this case, Ms. Van Dyne brought multiple issues to the table at the administrative level and before the district court. Nine to 12 separate issues on communication, behavior management plan. Ultimately, Judge Mize found that he was only getting about a half to three-quarters of the weekly minutes for MAP. And there's some remediation as a result of that? No, and I think that's reflective of how she considered that level of success. I think essentially what she was saying was, well, this is not a significant enough issue. What she essentially said was that, okay, district, you're falling a little short on the minutes. What I'm going to order you to do at this point is what's already in the IEP. I want you to just bring it up and implement the IEP as written. But she specifically did not order any what's called comp ed or compensatory education. And that, Judge Fischer, I think is what you refer to when ODE or an ALJ goes back and says, boy, you know what? This was a substantial enough deprivation where you're going to have to go back and provide, beyond his school day, you're going to have to provide 30 hours. He couldn't be the prevailing party if there's no comp ed? Well, not precisely. She didn't order comp ed. And also what she, and the test under the IDEA, like in 1983 cases, is for getting prevailing fees, there has to be a material alteration in the legal relationship of the parties. And essentially what she was, she didn't order any new relief, so that's part of the equation. Essentially all she was saying was, what's in the IEP? Just from here on out, just make sure you do it. She didn't order any additional relief, and therefore she didn't alter the legal relationship of the parties from that day forward. How large is the school? What's that? How large is this school? Which, the elementary or the middle school? Both of them. Well, if you've ever been to Baker City, it's not a very big town. Tell me. You know what? How many students are there in the school? I would defer to Ms. Van Dyne on that. I'm not, it's fairly small, but it's not a huge school. Well, that doesn't mean, that's meaningless. Yeah. Judge, I wouldn't want to represent. Is it that important? What's that? Is it important how large the classes are? I'm sorry, is it important how large the? Is it important is the question, how large the classes are? Well, I think the only area where class size came into issue was the issue of placement, which is kind of a legal argument that Ms. Van Dyne was making. She was claiming that, and I have 40 seconds left, and I think I can do this, but she's claiming that the placement was inappropriate. I think both the testimony at hearing and the case law is clear that ODE, IDEA case law, does not equate placement. Again, not a contract, so we're not using plain English. But under the IDEA, placement is a term of art that does not equate to physical locations. In other words, I'm placed in a Ninth Circuit courtroom, but that is not my educational placement. Placement is defined under the IDEA as basically the intensity of specially designed instruction and services that a child will receive. So the guidance at the time of this case was a self-contained classroom meant Christopher Van Dyne will be receiving 60% or more an amount of time, 60% or more of his day receiving specially designed instruction. Okay? And it's, again, it's a term of art, but it's not he's in a given room with X number of kids. Thank you, Counselor. Your time has expired. Thank you. Ms. Van Dyne, you have some reserve time. Thank you, Your Honor. IDEA regulations do require that special education related services be provided strictly in accordance with the IEP. It also requires that a good faith effort be made to assist the child to receive, to achieve each and every goal and objective of that IEP. Here we have a full record of performance of this school district. And 15 of 23 academic goals and objectives set for this child were not met or not addressed, and the record is clear on that. We also have an issue of the self-contained classroom and the placement itself that Christopher was, the situation he was put in to attempt to educate him. The AOJ refused to consider the present level of educational performance in the IEP, which is a fairly extensive description of Christopher's learning abilities and disabilities and how he could not be in a joint instruction classroom. He simply did not have the language, age, or agility to receive any benefit from a class like that. That's exactly the kind of class that he was put in at the Baker Middle School for more than half of his stay. IBEA regulations themselves, 1414E, states that it is not necessary in an IEP for the teen to restate what it has already put in one part of the IEP in another part of the IEP, yet the AOJ refused to consider this present level of educational performance when she tried to determine what the teen had left by his self-contained classroom. The testimony was very clear what the teen meant by a self-contained classroom when we used that term. We weren't using any 60% tests. Nobody knew about a 60% test until after this litigation started. What we know is what had worked, Christopher was in a self-contained classroom at the elementary school. The school district acknowledged that there was a self-contained classroom at the high school, took us over there, offered to put Christopher there. Did not make that accommodation for him at the middle school, which he clearly required. And the issue of the self-contained classroom is very critical because not only is it a limited number of students, limited amount of noise and confusion in the room, he has the flexibility to manage his own behavior instead of having to be extracted from the room, which is what happened. He would leave the room for 20, 30 minutes at a time because he could not manage his behavior. Obviously, he couldn't learn in that circumstance. I beg your pardon? Are you seeking private tutoring? At this point, he will require private tutoring because I think that he ages out of the school system, and I don't know legally if the school system could even continue to educate him there. He certainly will benefit from remediation that this court orders because he learns slowly and he continues to develop skills that are really critical for his life, his self-sufficiency and his life path. Can I clarify your position on Bobby R.? Yes, sir. Did I misstate you? Did you agree with the Fifth Circuit in its approach? I agree with the approach that the Fifth Circuit took. They looked at the statute and they said as long as there's not a diminution in services required by the IEP, we can't see that there has been more than a de minimis failure because of a timing issue. But they clearly said and looked at the regulations and said, you know, if the services required by the IEP were delivered, then that's what is required. And the record is full of a number of services not provided to Christopher here, consultations, autism consultations, all sorts of things not done. Thank you very much, counsel. The case just argued will be submitted for decision.
judges: Ferguson, O'scannlain, Fisher